Raymond T. LANG, Jr., Executor of the Estate of Joan Marie Lang, Deceased, Appellee,

v.

CITY OF DES MOINES, Iowa, Appellant.

No. 2–63713.

Supreme Court of Iowa.

July 16, 1980.

J. M. Sullivan, Des Moines Asst. City Atty., for appellant.

Nick Critelli, of Critelli & Foxhoven, P. C., Des Moines, for appellee.

Considered by REES, P. J., and UHLENHOPP, HARRIS, McCORMICK, and ALLBEE, JJ.

UHLENHOPP, Justice.

This wrongful death action against the City of Des Moines requires us to consider the adequacy of the trial court's instructions regarding the City's duty of care toward its jail inmates, the sufficiency of the evidence to warrant the instructions on damages, and the propriety of excluding as jurors all panel members who owned taxable real estate in Des Moines.

The case arose as a result of the death of Joan Marie Lang, which followed events that occurred on the morning of March 20, 1976. On March 19 Lang had walked away from a detoxification center where she had been receiving treatment for alcoholism on a voluntary basis. Police were alerted and Lang was taken into custody a few blocks from the center. The police offered to return her to the center but she refused, whereupon they took her to the police station and booked her for intoxication. A police matron typed notes on the back of the arrest report based on observations made by her and by the arresting officer. The notes included the admonition that Lang "would have to be watched" because she had attempted or threatened suicide, that her head and hands were shaking, and that she appeared to be "suffering from D.T.'s." The arrest report also included comments that Lang had been "in bad shape" when arrested but was "supposed to be a little better now." The latter comment, however, was followed by several question marks, which the police matron testified were intended to show her skepticism that Lang had in fact improved.

At approximately 9:40 p. m. on March 19, an officer placed Lang in an individual "St. Louis" cell. Such a cell is specially designed to provide guards with a better view of the inmate than is possible with other cells and to prevent the inmate from obtaining glassware of any kind. The matron testified that Lang was checked more frequently than other prisoners during the night, but did not specify how frequently. At approximately 5:15 o'clock in the morning Lang asked a matron for a cigarette and a cup of coffee because she felt she might be going into delerium tremens. The matron brought her the cigarette and coffee but took them away because she feared that Lang was shaking so badly that she would burn herself. The matron then left to seek instructions regarding what she should do if Lang were to go into delerium tremens. When she returned Lang was on her bunk and the matron did not disturb her.

Shortly thereafter the matron heard a noise and upon investigation found Lang lying on the floor of her cell. She testified that Lang was having a seizure-type of involuntary movement. The matron called other jail personnel who carried Lang into the hallway and talked with her. Jail personnel testified at trial that at the time Lang still appeared to be intoxicated but spoke coherently and exhibited no external signs of injury. She indicated a desire to return to the detoxification center, and the personnel placed her back in the cell. Approximately one-half hour later personnel removed her from her cell and took her to the booking room for the trip to the detoxi-

fication center. While in the booking room Lang began to experience violent seizures and appeared to lose consciousness fully or partially. Personnel took her to a hospital, where she lapsed into a coma from which she never recovered.

An autopsy performed a few days after Lang's death revealed that she had suffered a skull fracture which caused swelling and bleeding in the brain. The swelling and bleeding caused pressure on parts of the brain, which in turn resulted in loss of vital functions and eventual death.

Lang had been divorced about six months before her death. She was survived by four sons: Tom, 22, Richard, 21, David, 15, and Joe, 11.

The executor of Lang's estate brought this wrongful death action against the City of Des Moines alleging that Lang died as a result of the City's negligence during the time she was in the Des Moines jail. Trial to a jury resulted in a verdict of $65,603.90 against the City. The City appealed from the judgment.

I. *Instructions on City's duty of care.* The City's first contention relates to the trial court's jury instructions regarding the duty of care owed by the City to its jail inmates. Instructions 4 and 9 stated the standard of care the jury was to apply. Instruction 9 stated:

You are instructed that the City of Des Moines has a duty as to its prisoners in its custody to exercise ordinary and reasonable care in the following particulars, to-wit:

1. To provide reasonably safe surroundings for the care of Joan Marie Lang under all the circumstances.

2. To provide reasonable supervision or observation consistent with all the circumstances.

3. To use ordinary and reasonable care in providing for medical and physical services for injured or ill prisoners.

If you find that the defendant City of Des Moines has failed to exercise ordinary and reasonable care under any one or more of the foregoing specific obligations or duties such a failure will constitute negligence.

Instruction 4 complemented Instruction 9 by defining "ordinary care." It stated in part that "[o]rdinary care is that degree of care which an ordinary careful and prudent person would exercise under the circumstances." Aside from Instruction 4, the court did not enlarge on the specifications of negligence.

This court stated the substantive law on a jailer's duty of care in *Smith v. Miller*, 241 Iowa 625, 628, 40 N.W.2d 597, 598 (1950) (citations omitted):

Aside from statutory requirements a sheriff owes a general duty to a prisoner to save him from harm and he is personally liable for negligence or wrongful acts causing the prisoner's injury or death. In [*O'Dell v. Goodsell*, 149 Neb. 261, 30 N.W.2d 906, 909] it was held: "Beyond statutory requirements a sheriff is bound to exercise in the control and management of the jail the degree of care requisite to the reasonably adequate protection of the prisoners or inmates."

The court recently stated in *Barnard v. State*, 265 N.W.2d 620, 621 (Iowa 1978):

Although we have not considered a claim under Ch. 25A based on a fellow prisoner's assault during confinement in a state institution, we have held the Iowa Tort Claims Act permits an action by a prisoner injured by the state's negligence. *McBroom v. State*, 226 N.W.2d 41, 44 (Iowa 1975). The same rule applies when the state negligently permits one in its custody to be injured by the violent assault of another prisoner. Of course, the state is not an insurer of the prisoner's safety, but it must exercise reasonable care to protect him from harm.

The American Law Institute states that "[o]ne who is required by law to take . . . the custody of another under circumstances such as to deprive the other of his normal opportunities for protection" is under a duty (1) to protect the other against unreasonable risk of physical harm, (2) to give the other first aid after he knows or has reason to know that the other is ill or

injured, and (3) to care for the other until he or she can be cared for by others. *See* Restatement (Second) of Torts § 314A(1), (4). The Institute states in Comments *e* and *f* to section 314A:

> *e.* The duty in each case is only one to exercise reasonable care under the circumstances. The defendant is not liable where he neither knows nor should know of the unreasonable risk, or of the illness or injury. He is not required to take precautions against a sudden attack from a third person which he has no reason to anticipate, or to give aid to one whom he has no reason to know to be ill. He is not required to take any action where the risk does not appear to be an unreasonable one, as where a passenger appears to be merely carsick, and likely to recover shortly without aid.

> *f.* The defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured. He is not required to take any action beyond that which is reasonable under the circumstances. In the case of an ill or injured person, he will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained. He is not required to give any aid to one who is in the hands of apparently competent persons who have taken charge of him, or whose friends are present and apparently in a position to give him all necessary assistance.

██ The City advances several contentions. Initially it contends that the trial court's negligence instructions are too general, and it cites *Manley v. O'Brien County Rural Electric Cooperative*, 267 N.W.2d 39, 42 (Iowa 1978). In order to urge this objection successfully on appeal, however, the objector must have asked the trial court for more specific instructions. *See* Iowa R.Civ.P. 196; *LaSell v. Tri-States Theatre Corp.*, 235 Iowa 492, 503, 17 N.W.2d 89, 94 (1945). Although the City did object before the trial court that Instruction 9 was too general, it did not apprise the court of the particulars in which it should make the instruction more specific except to the extent we will presently consider regarding requested instructions. Because the City's objection to Instruction 9 was insufficiently specific, *See Wambsgans v. Price*, 274 N.W.2d 362, 365 (Iowa 1979), we do not consider it.

██ Next the City objects to the trial court's refusal to give the City's first proposed instruction. That instruction stated in part that the City "does not insure the safety of prisoners in the jail," and that it is not required to take any action for the care of the prisoners "where the risk does not appear to be unreasonable." *See* Restatement (Second) of Torts § 314A(1) and (4).

The City was entitled to have the court give the gist of this instruction. The question is whether the court did so. *See Mills County State Bank v. Fisher*, 282 N.W.2d 712, 716 (Iowa 1979); *Henneman v. McCalla*, 260 Iowa 60, 69, 148 N.W.2d 447, 452 (1967). The court informed the jury that the City had to exercise "that degree of care which an ordinary careful and prudent person would exercise under the circumstances." This however was the general instruction. Both sides are entitled to have their theories of the case presented to the jury, and the requested instruction device under Rule of Civil Procedure 196 is the mechanism parties may employ to achieve that objective. This requested instruction alerted the trial court to the City's contention. *See Elkader Cooperative Co. v. Mott*, 204 N.W.2d 873, 876 (Iowa 1973). While the court did not have to give the instruction verbatim, it should have given the thought of the instruction so that the theory of the defense was laid before the jury as well as the executor's theory. *See Walker v. Sedrel*, 260 Iowa 625, 632, 149 N.W.2d 874, 878 (1967); *Hamilton v. Becker*, 249 Iowa 516, 521, 86 N.W.2d 142, 145 (1957); *Mongar v. Barnard*, 248 Iowa 899, 915, 82 N.W.2d 765, 775 (1957). *See also, Robeson v. Dilts*, 170 N.W.2d 408, 414 (Iowa 1969) (instructions should "thoroughly and fully present the issues to the jury").

A third objection by the City is that the court did not give the City's second proposed instruction. That instruction stated in relevant part that "police officers cannot compel an intoxicated person to receive alcoholic treatment against his or her will." The City believed that such instruction was necessary to rectify what it termed an "incorrect statement of law" contained in the third specification of negligence in Instruction 9—that the City must employ "ordinary and reasonable care in providing for medical and physical services for injured or ill prisoners."

The evidence revealed two situations here. Lang left the detoxification center. She refused the offer of policemen to return her to the center. This evidence was before the jury and, on request, the City was entitled to have an instruction that the policemen could not force treatment there against Lang's will. The requested instruction alerted the trial court to this problem. See Porter v. Iowa Power & Light Co., 217 N.W.2d 221, 231 (Iowa 1974). On the other hand, events which subsequently occurred at the jail constituted substantial evidence for submission of the executor's charge of negligence of failing to give proper aid. Section 314A of the Second Restatement of Torts states in part that a jailer has a duty to take "reasonable action" to give inmates "first aid after [he or she] knows or has reason to know that they are ill or injured. . . ." The executor's specification of negligence based on the City's failure to give Lang proper aid appears to follow the Restatement theory of recovery ("The defendants . . . were negligent in the following particulars: . . . (g) In failing to . . . give aid to plaintiff's decedent while in custody, knowing that the plaintiff's decedent was injured."). The court should have tailored the instructions to cover the City's contention insofar as the evidence showed Lang refused to return to the center, and also executor's theory under the evidence relating to happenings in jail.

The court should have given the substance of the City's requested instructions adapted to the court's other instructions and the evidence.

II. *Instructions on damages.* The City's next contention relates to the trial court's jury instructions regarding recoverable damages. Included among the items submitted to the jury as the measure of damages were Lang's pain and suffering and the present values of (1) the amount Lang would reasonably be expected to have accumulated during the remainder of her lifetime, (2) the support which she would have contributed to her minor children, and (3) the value of the services she would have performed for her children, two of whom were adults. The City contends, on the basis of Lang's alcoholism and lack of employment at the time of her death, that substantial evidence does not appear in support of submitting any of these items of damage to the jury.

Initially we note that substantial evidence appears to justify submission of Lang's pain and suffering. We have stated damages for pain and suffering of a decedent may not be recovered "if death or unconsciousness is instantaneous," but "if substantial evidence shows the decedent did suffer pain the item is submissible although the period of consciousness was not protracted." *Schlichte v. Franklin Troy Trucks*, 265 N.W.2d 725, 727 (Iowa 1978), citing *Hurtig v. Bjork*, 258 Iowa 155, 160, 138 N.W.2d 62, 65 (1965). In this case the jury reasonably could have found that painful injury occurred well before Lang became unconscious and that the pain which she suffered was compensable. The trial court did not err in including pain and suffering as an item of damages.

The trial court also properly submitted the item as to the amount Lang would reasonably be expected to have accumulated during the remainder of her life had she lived. We recently outlined the factors relevant to such determinations. See *Iowa-Des Moines National Bank v. Schwerman Trucking Co.*, 288 N.W.2d 198, 201 (Iowa 1980). Those factors include "decedent's age and life expectancy, characteristics and habits, health, education, or opportunity for education, general ability,

other occupational qualifications, industriousness, intelligence, manner of living, sobriety or intemperance, frugality or lavishness, and other personal characteristics that are of assistance in securing business or earning money." *Id.* at 201. Although Lang had no savings at the time of her death and continued to suffer from alcoholism, evidence was introduced that a woman her age normally has a life expectancy of 32.18 years, that she had worked prior to her marriage, and that she was attempting to stop drinking. The jury could find that Lang's repeated attempts to overcome her alcohol problem would ultimately have been successful at least to the extent that she would one day return to the work force and begin to accumulate some funds, however few. *See Schmitt v. Jenkins Truck Lines, Inc.,* 170 N.W.2d 632, 655 (Iowa 1969) ("A person may not have worked or may have had no income prior to fatal injury but still suffer destruction of future earning capacity."). The trial court did not err in including future accumulations as an item of damages. We do not intimate of course that the jury was bound to allow anything for this item.

The trial court also properly allowed the jury to consider loss of support to Lang's minor children. This court has stated that "the law implies damages to minor children . . . ." *DeMoss v. Walker,* 242 Iowa 911, 913–14, 48 N.W.2d 811, 813 (1951). Moreover, the same evidence which supported the trial court's inclusion of expected accumulations could also be relied on by a rational trier of fact in finding that Lang would eventually obtain employment and contribute financially to the care of her minor sons. Whether such damages should or should not be allowed was for the triers of fact.

The trial court's submission of loss of services to Lang's children is more troublesome as the submission includes the two adult children. Although we said in *De-Moss* that the law implies damages to a decedent's minor children, we added that "adult children must prove their pecuniary loss." *Id.* As to Tom, the oldest child, we find only a scintilla of evidence that Lang's untimely death deprived him of valuable services. As to Richard we are unable to find any evidence whatsoever as to the type of relationship he shared with Lang after he reached adulthood. Richard was not called as a witness at trial, and was mentioned only once in Tom's testimony—relating to Lang's interest in her sons during a time period well before Richard attained his majority. The trial court erred in allowing the jury to consider loss of services to Tom and Richard as an item of damage. Substantial evidence of such loss does not appear.

III. *Jury members.* The City's final contention is that the trial court erred in excluding from the jury all Des Moines property taxpayers. Under Iowa case law, the exclusion was not error. *See Beyer v. City of Dubuque,* 258 Iowa 476, 486, 139 N.W.2d 428, 435 (1966) ("We are satisfied that when an action in tort is brought against a municipality and others as parties defendant, plaintiff may nevertheless effectively challenge any members of the jury panel who are taxpayers in the defendant municipality."). The City argues, however, that we should reconsider *Beyer* in light of United States Supreme Court case law decided since *Beyer.*

In *Beyer* this court held that a defendant is not deprived of a fair trial under the Iowa Constitution by the exclusion of all property taxpayers from a jury which is hearing a suit against the city, and relied on *Hoyt v. Florida,* 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961). *Hoyt* involved the issue of whether a Florida law which provided that no woman could be called for jury duty unless she declared a desire to be placed on a jury list was violative of a defendant's right to equal protection and due process of law under the Fourteenth Amendment. 368 U.S. at 58, 82 S.Ct. at 160–61, 7 L.Ed.2d at 120. *See Taylor v. Louisiana,* 419 U.S. 522, 533–34, 95 S.Ct. 692, 699, 42 L.Ed.2d 690, 700 (1975). The *Hoyt* Court reasoned that because the classification in question had a rational basis—"woman is still regarded as the center of home and family

life"—it was not violative of those constitutional guarantees. 368 U.S. at 62, 82 S.Ct. at 162, 7 L.Ed.2d at 123. *Beyer* relied on the same type of rational basis analysis. 258 Iowa at 486, 139 N.W.2d at 435.

Subsequent to *Hoyt* the United States Supreme Court held a state statute unconstitutional which provided for essentially the same type of exclusionary scheme that had been challenged in *Hoyt*. *Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S.Ct. 692, 697–98, 42 L.Ed.2d 690, 698 (1975). The precursor to *Taylor* was *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491, 497 (1968). *Duncan* held the Sixth Amendment applicable to the states through the Fourteenth Amendment. In *Taylor* the Court found that criminal defendants have a Sixth Amendment right to have their juries selected from a representative cross section of the community. It also held that a state may not deprive a criminal defendant of that right on merely rational grounds, *id.*, 419 U.S. at 534, 95 S.Ct. at 699–700, 42 L.Ed.2d at 700, and that the State of Louisiana had failed to show sufficient justification for systematically excluding women from its jury selection process. *Id.* at 534, 95 S.Ct. at 700, 42 L.Ed.2d at 701. The City contends we should reconsider *Beyer* in view of *Taylor*.

We decline to retreat from our past approval of the exclusion of property taxpayers from juries deciding civil actions in which their cities are named defendants. The rationale of the *Taylor* decision is inapplicable here. *Taylor's* authors were careful to note that the decision was based on a criminal defendant's Sixth Amendment rights. *Id.* at 534, 95 S.Ct. at 699, 42 L.Ed.2d at 700. The Sixth Amendment applies to criminal trials ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."). This court has long disapproved exclusion of taxpayer jurors in criminal actions. *See State v. Backman*, 198 Iowa 1300, 1301, 201 N.W. 25, 26 (1924). Moreover, we are not dealing with exclusion of women from this jury but rather city taxpayers. We uphold the trial court's exclusion of taxpayer jurors.

In light of the errors we have found, the case must be retried.

REVERSED.